[No. B179756. Second Dist., Div. Four. Sept. 13, 2005.]

In re NAOMI P., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Appellant, v.
J.B. et al., Defendants and Respondents

Counsel

Raymond G. Fortner, County Counsel, Larry Cory, Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Plaintiff and Appellant.

Judy Weissberg-Ortiz, under appointment by the Court of Appeal, for Defendant and Respondent J.B.

Kimberly A. Knill, under appointment by the Court of Appeal, for Defendant and Respondent Hank P.

Opinion

**CURRY, J.—**

## INTRODUCTION

The Los Angeles County Department of Children and Family Services (DCFS) appeals from the order of the juvenile court following a Welfare and Institutions Code section 366.26 selection and implementation hearing in which it selected a permanent plan of legal guardianship based on its finding that the sibling relationship exception to termination of parental rights is applicable. (§ 366.26, subd. (c)(1)(E).) DCFS claims the record does not contain evidence sufficient to support application of the exception. We conclude the juvenile court had before it substantial evidence to support its finding that the exception is applicable. We therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Naomi P. was born in August 2001. The child's mother, J.B. (Mother), admitted to using drugs during her pregnancy with Naomi. Naomi was detained at the hospital by DCFS and placed in foster care.

DCFS filed a Welfare and Institutions Code section 300 petition on August 13, 2001, alleging that Naomi was a person described by Welfare and Institutions Code section 300, subdivisions (b) and (j). Specifically, DCFS alleged that both Mother and Naomi's father, Hank P. (Father), had histories of drug abuse. In addition, Mother had previously failed to reunify with her three older children, Anthony A. (born in August 1988), Joshua T. (born in September 1991), and Victoria L. (born in August 1993).[1] The three older

---

[1] Hank P. is not the father of any of the three older children.

children live with their maternal grandmother, who was appointed their legal guardian.

DCFS reported for the pretrial resolution conference that the older siblings visited Naomi whenever possible, usually for three-hour visits.

On September 20, 2001, the court sustained the Welfare and Institutions Code section 300 petition, as amended.

In November 2001, Naomi was placed with Mother's cousin, Veronica N., thus enabling Mother to have three visits per week. The placement was also closer to the maternal grandmother's home and allowed the older siblings to visit Naomi more often. Veronica also had three daughters of her own.

At the disposition hearing on November 19, 2001, the court declared Naomi to be a dependent of the court, and ordered her removed from her parents' custody. DCFS was ordered to provide family reunification services. Mother was ordered to participate in a parenting course and individual counseling, group counseling, and drug rehabilitation with random drug testing. Mother and Father were permitted to have monitored visits three times per week.

For the six-month review hearing (Welf. & Inst. Code, § 366.21, subd. (e)) in May 2002, DCFS reported that the parents were not complying with the court-ordered drug testing and rehabilitation, counseling, or with the visitation schedule. DCFS recommended termination of reunification services.

Naomi's siblings and maternal grandmother visited her in Veronica's home. Veronica was willing to provide long-term foster care for Naomi if Mother was not successful in reunifying. The maternal grandmother stated her desire to become Naomi's legal guardian so she could live with her siblings; she hoped to move to a larger home in order to do so.

The court continued the matter for a contested disposition hearing on the issue of termination of reunification services. Mother's request to have the maternal grandmother's home evaluated for placement of Naomi was denied. Naomi has severe medical problems (asthma) but was doing well in her current placement.

In June 2002, DCFS informed the court that the maternal grandmother had decided not to pursue legal guardianship, and Veronica was willing to pursue adoption. Naomi's siblings continued to visit her weekly in Veronica's home. At the continued disposition hearing, the court terminated family reunification

services for both parents and set a Welfare and Institutions Code section 366.26 selection and implementation hearing for September 2002.

For the Welfare and Institutions Code section 366.26 hearing in September 2002, DCFS reported that Veronica had decided not to adopt Naomi, and wished instead to be appointed her legal guardian. As Naomi was found to be living with a relative who was unable or unwilling to adopt, but was able to provide her with a permanent home, the court appointed Veronica as Naomi's legal guardian, and letters of guardianship were issued. Naomi continued to have weekly visits with her siblings and maternal grandmother at Veronica's home.

Status review hearings (Welf. & Inst. Code, § 366.3) were held in March 2003 and September 2003. DCFS reported that Naomi continued to receive appropriate care from Veronica, her legal guardian. Naomi's siblings continued to visit her weekly. Mother visited only sporadically, and Father visited only once. The court found the current placement plan to be appropriate.

In December 2003, DCFS filed a Welfare and Institutions Code section 387 supplemental petition stating that Veronica was no longer willing or able to care for Naomi. On June 17, 2003, DCFS received a referral alleging emotional abuse and general neglect against Veronica with regard to her daughters. Veronica was compliant with DCFS and the case was closed on July 14, 2003. However, Veronica informed DCFS in December 2003 that she could no longer care for Naomi because of the difficulty she was having with her own children. Naomi was removed from Veronica's home, and placed with Virginia H., a nonrelative family friend.

The court set a hearing on the Welfare and Institutions Code section 387 supplemental petition for February 4, 2004. On that date, the matter was continued to March 16, 2004. DCFS filed a petition to terminate the guardianship, and a hearing was set for March 5, 2004.

DCFS reported that Naomi was doing well in Virginia's home. Naomi continued to have weekly visits with her siblings. The maternal grandmother wished to become Naomi's legal guardian, and DCFS recommended that as the permanent plan for Naomi. DCFS noted that placement with the grandmother "would be in Naomi's best interest because she will have the opportunity to grow up with her siblings." The court sustained the Welfare and Institutions Code section 387 supplemental petition and terminated Veronica's guardianship, and also set a Welfare and Institutions Code section 366.26 hearing for July 2004.

In March 2004, DCFS reported that the maternal grandmother was having difficulty with Joshua, the middle sibling in her care. He had been expelled

from school for numerous acts of inappropriate behavior. DCFS and the maternal grandmother agreed that it would be best to wait to place Naomi in the home so the grandmother could focus on stabilizing Joshua.

For the hearing in July 2004, DCFS reported that Naomi had developed a strong bond with Virginia since being placed in her care in December 2003. Virginia had expressed a desire to adopt Naomi. The social worker noted that placement with Virginia would enable Naomi "to keep her ties with her siblings and other family members." Virginia stated that since she is a family friend, Naomi would be able to grow up with her family. She would allow sibling visits to continue after adopting Naomi. Naomi continued to have weekly visits with her siblings and grandmother in Virginia's home. DCFS therefore recommended termination of parental rights and selection of adoption as the permanent plan.

The matter was continued for a contested Welfare and Institutions Code section 366.26 hearing to October 20, 2004. Since July, Naomi had continued to have weekly visits with her siblings. DCFS reported for the October 2004 hearing: "Court is to be aware that Naomi has never resided in the home of her siblings or grandmother. Therefore, there does not appear to be a strong bond. In addition, caregiver has reported that Naomi never asks to talk to or visit her siblings, mother or grandmother. However, [Virginia] has agreed to an open adoption as long as it is in the best interest of Naomi. According to caregiver, she would like for Naomi to have a relationship with her siblings." The social worker advised Virginia to document the dates of phone calls and visits with Naomi's siblings. According to Virginia, the maternal grandmother contacted her once during September for a visit, and during the first three weeks of October, she contacted her once for a visit but Naomi was unable to visit because of her asthma.

At the hearing, counsel for Anthony, Joshua, and Victoria informed the court that until a few weeks earlier, Naomi had been having overnight weekend visits with her siblings at the maternal grandmother's home. The social worker had disallowed those visits. The court ordered that the previous visitation order, whether for daytime or overnight visits, was to continue in effect.

In addition, the older siblings' counsel requested completion of a sibling bonding study by an Evidence Code section 730 evaluator to assess the relationship with Naomi. Counsel for Mother joined and counsel for Naomi had no objection. The court denied the request, stating that the court could hear from the children and decide whether there is a significant bond and if the sibling relationship exception applies. The matter was continued for further hearing to November 30, 2004.

On November 12, 2004, Mother filed a Welfare and Institutions Code section 388 petition requesting that Naomi be placed with her, or that she be allowed to have unmonitored and/or weekend visits. Alternatively, Mother requested that Naomi be placed with the maternal grandmother. The court granted a hearing and set November 30, 2004, as the hearing date for the section 388 petition.

On November 30, 2004, DCFS filed an interim review report. The social worker had interviewed Anthony, Joshua, and Victoria about the possibility of Naomi being placed with a relative, Jackie, in Chicago. Anthony said he did not care if Naomi went to Chicago, because he just wanted her to be with his family. He did not know Virginia and "would just feel better if she were with Jackie. She's nice and she would take care of her. I know Jackie and she's our family. [Virginia] is not [a] relative." Joshua stated: "I[t] doesn't really matter to me. I would just rather see her with family. Anyway we can see her when we go to visit in the summer. Jackie is fun. Naomi would like it there." Victoria stated: "I don't care. I would be happy if she went to be with my cousin. We could see her during the summer and maybe we can fly out there during Christmas and Thanksgiving. All we would have to do is fly on the plane to see her. We would at least see her at the family reunion."

The maternal grandmother stated that she would love to have Naomi live with her, but she was having so many problems with Joshua that she felt she could not do it. She did not want Virginia to adopt Naomi because she is not family, although legal guardianship would be fine. She was adamant about opposing adoption. "As for her visiting her brothers and sister, they are fine with it. Just ask them. They'll tell you. They want her to be with Jackie. They completely understand. We can see Naomi on Christmas and the Summer. Anyway, most of my family is in Chicago. My mother and a lot of other relatives are there. I may plan to move there in the future. I think it would be better for the kids to be in a different environment."

Virginia stated that she wanted Naomi to have a stable home. She said that she loves Naomi "as if she were my own. I would never try to stop her from seeing her brothers and sister. She has been in the system for too long. I know that is her family but why has [she] been in so many foster homes? I am willing to provide her with love and stability. I am able and willing to provide for all of her needs."

The social worker noted that the maternal grandmother was told she could not have Naomi for overnight visits unless she obtained a bed for Naomi. She also noted that all of the siblings stated that they did not care if Naomi moved to Chicago. Each was adamant that they would prefer Naomi to live with a relative in Chicago rather than with Virginia. Noting that Naomi had never

lived with her parents, maternal grandmother, or siblings, the social worker opined: "It does not appear that [a] strong bond does exist." DCFS continued to recommend termination of parental rights and adoption.

At the hearing on November 30, 2004, the court denied Mother's Welfare and Institutions Code section 388 petition, finding that Mother had not shown any change of circumstances to justify a change in existing orders.

The social worker, who had been assigned to the case for six months, testified that Naomi was adoptable, and it would be in her best interests to be adopted, even considering her relationship with her siblings. She admitted that she had never seen the children interact with one another prior to the day of the hearing. The social worker did not consider the cousin in Chicago to be a viable option for Naomi's placement because Naomi had met her only twice and did not know her.

The social worker explained that the sibling visits took place during the day, from the morning until 6:00 or 8:00 in the evening. She did not believe that Naomi had a strong bond with her older siblings because they never lived together, and based upon the siblings' statements that they did not care if Naomi moved to Chicago. She did not ask the children how they would feel if Virginia adopted Naomi and they were not allowed to visit. They were all opposed to Virginia adopting Naomi because she was not a family member. She saw the children interacting outside the courtroom, and observed that their interaction was good and that they seemed to enjoy each other's company. She had never asked Naomi, then three years old, how she felt about her siblings. She knows that they are her brothers and sister. Naomi told the social worker that she liked going to her grandmother's house, and enjoyed attending the summer family reunion in Chicago with her siblings.

Joshua testified that he loved his little sister Naomi. He had seen her on a regular basis since she was born. He liked to play with their cats with her, ride her around on his bike, and play tag and catch with her and his other sister. Sometimes Naomi read books and colored with Victoria and their cousin. He said Naomi runs around and smiles and is happy. When she sees him, she screams his name and runs to him and he hugs her. Joshua calls her "Nay-nay." Naomi was not allowed to play with Joshua's video games because she was little and might break them. They had taken her to church a few times, and to the drive-in movie. They once went to the county fair. Joshua said that he treats Naomi "good" and "special." "We let her do a lot of things," like use his scooter, because he only gets to see her sometimes. Joshua said he spoke to Naomi on the telephone a lot. Naomi sometimes got mad when it was time to leave her grandmother's house at the end of a visit.

If he were not able to see Naomi anymore, it would not make him feel good and he would be angry. He did not want Virginia to adopt Naomi because he hoped Mother could get her back. But if Virginia's adopting her had to happen, he would be okay with it. He was afraid that if Virginia adopted Naomi, he would not be able to see her anymore. He did not know that if Virginia adopted Naomi, it would be up to her whether Naomi could visit her siblings, and she could decide she did not want visits to continue. He said that would make him feel bad. "I don't want her to adopt her. If that's going to happen, then I don't want nobody to adopt her but somebody that I know."

Joshua had visited Naomi at Virginia's house many times. Sometimes when they called Virginia to ask if Naomi could come over, Naomi was unable to visit because they already had plans. Joshua feared that if Virginia and his grandmother got into a fight, Virginia would not let Naomi visit. He said his grandmother gets into arguments with lots of people, although she got along okay with Virginia so far.

Anthony testified that he tries to see Naomi every Saturday, but sometimes she's not available; she's busy, and they have to wait until another Saturday. He said that when Naomi comes to his house, they joke around and play in the yard. She plays hula hoop or jumps rope with Victoria. She calls him "brother, " but knows his name is Anthony. She always smiles when she sees him and gives him a hug. He stated that he does not want Naomi to be adopted because he does not really know Virginia "the way I should know her. She's been with her for a while. But I'd rather . . . not take any chance of, if she does adopt her, then, I probably won't be able to see my sister again. And I don't want to have that at all. It's not good. No." The first thing he thought when he heard about the adoption was that he worried Naomi might not be allowed to visit anymore. He also worried that his grandmother might decide to move out of state. If she did, he would try his hardest to get his grandmother to visit Naomi, even if it was just for vacation. Anthony considers Naomi to be a part of his family. "She's full, full family." He considers Naomi to be his sister as much as Victoria. They always try to include Naomi in family events. If she cannot make it, it is only because she is already busy. There are pictures of all of the children, including Naomi, in the grandmother's home. Anthony stated that Naomi has her own clothes, books, and toys at his grandmother's house. When they pick her up at Virginia's house for visits, she never cries; she is always ready to go. Sometimes she does not want to go back to Virginia's house at the end of visits.

He talks to Naomi on the telephone more often than she visits. Most of the time she sounds excited when they talk on the phone, and usually she asks him when she is going to come over again.

Anthony stated: "I think she needs to be with us as much as she can because just losing—I mean, any kind of amount of time with my sister can mean everything because she's still young right now. So it's hard to—you know, she has to know us right now, get to know us good. And that's one reason why she should continue to visit."

Anthony said that he has no reason to think that Virginia is not a good caretaker for Naomi. She is friendly to his grandmother. He has never talked to Virginia about whether she would allow visits with Naomi to continue.

Victoria testified that when Naomi comes over, they watch movies together. She calls Naomi "Nay-nay," and Naomi calls her "Vicky." Naomi mostly likes to play with Joshua and their cousin Tyshea when she comes over. She does not really like to play with Victoria; "only sometimes."

Victoria thought it was important that Naomi went to the family reunion in Chicago so the family in Chicago could meet her. Victoria considers Naomi to be "less family" than her brother because she does not live at their house. She would want Naomi to live at her house if she had her own room. She does not like it when Naomi plays with her stuff because she messes up her room and does not put things away. She sometimes gets mad at Naomi.

Victoria does not want Virginia to adopt Naomi because she is not part of her family. She does not think Virginia would ever prevent them from visiting Naomi. She would not like it if that happened because then she would not be able to see her again until they were grown up. She thinks Virginia is friendly, and that she takes good care of Naomi. Virginia knows that they are Naomi's family.

Virginia testified that when Naomi first came to live with her in December 2003, the maternal grandmother and siblings would visit Naomi at her home, usually for two hours every other weekend. After a few months, the grandmother began picking Naomi up and taking her home for the day, about two or three times a month. Naomi looks forward to the visits and is happy to go. Sometimes she would be a little upset when she returns home; Virginia was not sure why. Every now and then she would talk about her visits with her siblings. The maternal grandmother calls Naomi maybe once a month or every other week, and Mother calls sometimes. Naomi also talks to her siblings when the grandmother calls. She looks forward to the phone calls with her siblings, and hands Virginia the phone and tells her, for example, "Granny, this is Anthony."

Virginia thinks it is important for Naomi to visit with her siblings and grandmother. She has never had a problem with her going to visit her

siblings. She just does not want Naomi to "pick up certain things." For example, Naomi bit another child after she had a visit with her siblings, and she said she got it from her brother. In addition, she sometimes hits and pushes other children.

Virginia described Naomi as a very loving and affectionate person. She is very attached to Naomi and wants to adopt her so she will be looked after and loved. She is willing to become Naomi's legal guardian if she were unable to adopt her, but she prefers adoption. She would continue to allow Naomi to visit and have telephone calls with her siblings, grandmother, and Mother if she adopted her. The grandmother lives within a few miles of her. Even if the grandmother were to move out of state, she would be willing to arrange visits. Asked how her relationship is with the maternal grandmother, she replied, "Good so far, as far as I know." Even if she stopped getting along with the grandmother, she would still allow Naomi to visit. She does not have much of a relationship with Naomi's siblings. They wait in the car when the grandmother comes to pick up Naomi. If she did not get along with the children, she would still allow Naomi to visit. When the siblings and grandmother visited Naomi in Virginia's home during the first few months Naomi lived with her, their visits were pleasant. She had invited them to come to her home four or five times since then, but they had not done so.

Virginia occasionally had problems with the visits because Naomi was supposed to be back in three or four hours, but she would stay for the whole day at the grandmother's house. She believes that Naomi loves her brothers and sister and would like to spend more time with them. Naomi would be sad if she were not allowed to continue having visits. She knows that they are her brothers and sister. Virginia did not think Naomi would be harmed, however, if she was not able to visit them.

Mother testified that she visited the maternal grandmother's house when Naomi was visiting, and had observed Naomi's interactions with the older children. She said they interacted as siblings would, and that Naomi loved it at her grandmother's house. At first she cried when she had to return to Virginia's house, but later when she was comfortable at Virginia's house she no longer cried and would say, "I'm going to see you next week." Joshua liked to play rough with Naomi, and would put her over his shoulder and run around. She would scream and yell and happily jump around.

Mother believed Virginia would stop allowing visits if she were allowed to adopt Naomi. She said Virginia stopped returning Mother's phone calls after she decided to adopt Naomi. Mother recalled only twice, however, that Virginia did not allow her to visit Naomi, and that was because the child was sick.

The maternal grandmother testified that Naomi enjoyed the visits. She used to spend the whole weekend with them before she was placed with Virginia. Naomi would sleep in her bed with her. The overnight visits had continued for the first few months she lived with Virginia, but stopped because the grandmother did not have a separate bed for her. Naomi never asked to stay at the grandmother's home when visits ended. They continued to visit once per week and on holidays, and spoke on the telephone once a week. She said that Joshua is Naomi's buddy, and they play a lot. Victoria is more reserved and plays quietly.

The grandmother was concerned about whether Naomi could continue to have contact with her siblings if Virginia adopted her, because adoption meant that Naomi would become part of Virginia's family. She acknowledged that Virginia had told her that she would allow the visits to continue. She had no reason to believe that Virginia was lying.

DCFS argued that the sibling relationship exception to termination of parental rights had not been established. Naomi's counsel's position was equivocal. She stated that there is no question that Naomi has a very good relationship with her siblings. She questioned, however, whether the relationship was sufficiently substantial. They had shared common experiences, but because they had never lived together, she questioned whether the exception had been met. Even assuming that Naomi would suffer detriment if the relationship ended, she stated that there was no evidence that the visits would be discontinued. She therefore opined that the benefit of permanency was not outweighed by the benefit of continuing the relationship because the latter was expected to continue.

Counsel for the siblings argued that the exception had been proven, and stressed the growing body of expert opinion to the effect that sibling relationships are extremely important, particularly in families facing difficulty as this one has. Mother's counsel agreed.

The juvenile court found Naomi to be adoptable. As to the sibling relationship exception, the court noted that the social worker opined that the relationship was not strong, but she had never observed the children's interactions. The court found that the social worker had not included in the reports sufficient information about the important people in Naomi's life.

Regarding the children's testimony, the court said: "The one thing that struck me about all of the children's testimony was their demeanor. Each had a happy, joyful expression on their face when they talked about Naomi." The court recounted some of the children's testimony and noted: "These are descriptions of a true sibling relationship. Siblings love each other. They also, at times, annoy each other. It was very clear to me how very deeply these children love their little sister." The court recognized that the situation had to be considered from Naomi's point of view, and not just the siblings' point of view. "It was really hard for me to believe that . . . the happiness that these children have in visiting with their sister was only on their part. I suspect that, if Naomi . . . did not enjoy the visits, these children would not have wanted them. . . . All of the children could have had better things to do on a Saturday. Anthony is 16. But they chose to spend it instead with their little sister." The court therefore found that there is a significant and substantial sibling relationship between Naomi and her siblings, and that they have strong bonds and common experiences. "Living together is not determinative. . . . It appears that these siblings have been a constant thread in this young child's life and that there is a compelling reason to believe that continued contact is important for this child's long-term emotional well-being. The sibling relationship is an enduring one. It begins in infancy, as this one has, and extends into old age."

The court continued: "I was not convinced by [Virginia's] testimony. I have some doubts about her intentions. It did not appear to me that she understood the importance of the sibling relationship. Terminating parental rights would substantially and adversely affect the sibling relationship. So I find there is a compelling reason to order legal guardianship."

The court ordered overnight visits to resume. Mother is not to stay overnight.

DCFS filed a timely notice of appeal from the above findings and orders of December 2, 2004.

On January 10, 2005, letters of legal guardianship were issued and Virginia was appointed Naomi's legal guardian. The court ordered overnight visits at least twice per month, and the guardian and maternal grandmother could work out additional visits as they saw fit. Telephone contact was ordered to be permitted twice per week. DCFS also filed a notice of appeal from the court's findings and orders of January 10, 2005.

## DISCUSSION

Welfare and Institutions Code section 366.26 provides in relevant part: "If the court determines, based on the assessment provided as ordered under subdivision (i) of Section 366.21 or subdivision (b) of Section 366.22, and any other relevant evidence, by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption. . . . A finding . . . under Section 366.21 or 366.22, that the court has continued to remove the child from the custody of the parent or guardian and has terminated reunification services, shall constitute a sufficient basis for termination of parental rights unless the court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] . . . [¶] (E) There would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption."

■ "The Legislature has thus determined that, where possible, adoption is the first choice. 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348 [93 Cal.Rptr.2d 644].) 'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.' (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1344 [63 Cal.Rptr.2d 562].)" (*In re Celine R.* (2003) 31 Cal.4th 45, 53 [1 Cal.Rptr.3d 432, 71 P.3d 787].) "At this stage of the dependency proceedings, 'it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home.' (*Cynthia D. v. Superior Court* [(1993)] 5 Cal.4th [242] at p. 256 [19 Cal.Rptr.2d 698, 851 P.2d 1307].) The statutory exceptions merely permit the court, in *exceptional circumstances* (*In re Jasmine D., supra,* at pp. 1348–1349), to choose an option other than the norm, which remains adoption." (*In re Celine R., supra,* 31 Cal.4th at p. 53.)

■ When considering the sibling relationship exception, the concern is the best interests of the child being considered for adoption, not the interests of that child's siblings. "[T]he court may reject adoption under this sibling relationship provision only if it finds adoption would be detrimental to the child whose welfare is being considered. It may not prevent a child from being adopted solely because of the effect the adoption may have on a sibling." (*In re Celine R., supra,* 31 Cal.4th at pp. 49–50.)

■ However, consideration of Anthony, Joshua, and Victoria's testimony was relevant here as it provided indirect evidence of Naomi's best interests. She was too young to testify for herself. As the court stated in *Celine R.*: "Counsel for the children argues that the 'court must examine the relationship among all the siblings in considering' the sibling relationship exception and 'may not restrict its inquiry to the children at issue in the hearing before the court.' In a way, this is correct. The sibling's relationship with the child is not irrelevant. Certainly, evidence of the sibling's relationship with the child and, if the sibling is articulate, perhaps of the sibling's views of that relationship, might be relevant as indirect evidence of the effect the adoption may have on the adoptive child. A nonadoptive sibling's emotional resistance towards the proposed adoption may also implicate the interests of the adoptive child. In an appropriate case, the court should carefully consider all evidence regarding the sibling relationship as it relates to possible detriment to the adoptive child. But the ultimate question is whether adoption would be detrimental to the adoptive child, not someone else." (*In re Celine R., supra*, 31 Cal.4th at p. 55.)

■ DCFS contends on appeal that the parents did not meet the heavy burden of establishing the exceptional circumstances to justify choosing a permanent plan other than adoption. "Reflecting the Legislature's preference for adoption when possible, the 'sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption. It only applies when the juvenile court determines that there is a "compelling reason" for concluding that the termination of parental rights would be "detrimental" to the child due to "substantial interference" with a sibling relationship.' (*In re Daniel H.* [(2002)] 99 Cal.App.4th [804] at p. 813 [121 Cal.Rptr.2d 475], quoting [Welf. & Inst. Code,] § 366.26, subd. (c)(1).) Indeed, even if adoption would interfere with a strong sibling relationship, the court must nevertheless weigh the benefit to the child of continuing the sibling relationship against the benefit the child would receive by gaining a permanent home through adoption. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952–953 [124 Cal.Rptr.2d 688].)" (*In re Celine R., supra,* 31 Cal.4th at p. 61.)

Consideration of the published cases regarding the sibling relationship exception are of somewhat limited value to us because they all involve situations in which the court has found the exception inapplicable. The parties have not cited, and our research has not found, any published case in which a juvenile court has found applicable the sibling relationship exception, as did the court here. Nonetheless, we have no difficulty in concluding that the court

had before it sufficient evidence to conclude that the exception applied, and that the benefits to Naomi of ensuring continuation of that relationship even outweigh the benefit that the permanency of adoption would confer.

■ The juvenile court had the opportunity to observe the demeanor of the relevant witnesses: Anthony, Joshua, Victoria, Virginia, the maternal grandmother, and Mother. In finding the exception applicable, the court specifically noted that it relied on the demeanor of the witnesses in making its decision. ■ It is not our role to interfere with the trial court's assessment of the witnesses' demeanor and credibility. We particularly note the juvenile court's description of the older children's "happy, joyful expression on their face when they talked about Naomi." The trial court's observation of such testimony constituted powerful demonstrative evidence that it would be in Naomi's best interest to ensure continuation of the relationship.

■ In addition, it was clear that this extended family considered it important from the outset for the siblings to visit and for Naomi to know her relatives. As the court stated, "these siblings have been a constant thread in this young child's life and . . . there is a compelling reason to believe that continued contact is important for this child's long-term emotional wellbeing." We agree with the trial court's assessment that "[l]iving together is not determinative."

Importantly, the juvenile court also observed that, having heard Virginia testify, it had some doubts about her intentions, and of her appreciation of the importance of Naomi's sibling relationships. On that basis, the court had reason to question whether, if adoption were ordered, visitation would be allowed to continue to the extent Naomi needs. Undoubtedly Virginia is a loving, capable caregiver for Naomi, and desires to do what is best for her. However, the court determined that guardianship was necessary in order to ensure continuation of the sibling relationship. We will not interfere with the court's conclusion in this regard, nor with the court's order that overnight visitation resume to the extent it had been enjoyed prior to Naomi being placed with Virginia and the new social worker being assigned to her case.

The juvenile court had before it substantial evidence to support its conclusion that all requirements had been met to justify application of the sibling relationship exception. We will not disturb the conclusion that "[t]erminating parental rights would substantially and adversely affect the sibling relationship," and that "there is a compelling reason to order legal guardianship."

## DISPOSITION

We affirm the challenged orders.

Epstein, P. J., and Willhite, J., concurred.